IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MELISSA B. DeMARSH,

                Plaintiff,

                                      Civil Action

v.

                                      Case No. 08-2588-JWL/GLR

TORNADO INNOVATIONS, L.P.,
d/b/a THE RIGHT ONE,

                Defendant.

## REPORT AND RECOMMENDATION

## NOTICE

Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, file written objections to such proposed findings and recommendations, including any findings of fact and conclusions of law. A party must file any objections within the ten-day period allowed if that party wants to have appellate review of the proposed findings of fact, conclusions of law, and the recommended disposition. If no objections are timely filed, no appellate review will be allowed by any court.

## REPORT AND PROPOSED FINDINGS

This matter comes before the Court upon Plaintiff's Motion for Default Judgment (doc. 15). By Minute Order dated July 16, 2009, District Judge John W. Lungstrum referred the Motion to the undersigned Magistrate Judge for report and recommendation and for hearing upon the issue of damages. On September 8, 2009, the Magistrate Judge conducted an evidentiary hearing to determine damages and took the matter under advisement to review the evidence and applicable law.

As set forth below, the Magistrate Judge recommends that the Motion for Default Judgment be granted and Plaintiff be awarded non-economic, compensatory damages in the amount of $300,000 and post-judgment interest at the rate provided in 28 U.S.C. § 1961(a).

**I.      Procedural History**

On June 1, 2009, Plaintiff filed her First Amended Complaint against Defendant for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  In her First Amended Complaint, Plaintiff alleges she suffered damages as a direct and proximate result of actions and inactions of Defendant.  She alleges she was deprived of lost income, as well as other monetary and non-monetary benefits.  She further alleges she suffered humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and related compensatory damages as the result of the discriminatory practices of Defendant.  Plaintiff also seeks punitive damages, as provided in Title VII.  Her First Amended Complaint prays for judgment against Defendant in the amount of $300,000 for non-economic, compensatory damages, as well as post-judgment interest.

On July 7, 2009, the Clerk of the District Court, pursuant to Fed. R. Civ. P. 55(b)(1), entered a Clerk's Entry of Default (doc. 14) against Defendant for failure to file an answer or other responsive pleading to Plaintiff's First Amended Complaint.  On July 8, 2009, Plaintiff filed her Motion for Default Judgment (doc. 15), requesting that, pursuant to Fed. R. Civ. P. 5(b)(2), the Court enter default judgment against Defendant and that a hearing be held to determine the amount of damages to be awarded.

On September 8, 2009, the Court conducted an evidentiary hearing to determine the amount of damages.  At that hearing, Plaintiff renewed her request for judgment against Defendant in the

amount of $300,000 for non-economic, compensatory damages and for post-judgment interest at a rate provided by law.

## II.    Legal Standard

Federal Rule of Civil Procedure 55(a) allows a default against a party when that party has "failed to plead or otherwise defend" itself.  Following entry of default by the clerk, Fed. R. Civ. P. 55(b)(2) permits a district court to enter default judgment.  In cases where the plaintiff's claim is not for a sum certain or a sum made certain by calculation, the plaintiff must apply to the court for a default judgment.[1]  "The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to . . . determine the amount of damages."[2]

"Once the default is established, defendant has no further standing to contest the factual allegations of plaintiff's claim for relief."[3]  The well-pleaded factual allegations of the plaintiff's complaint are taken as true, except for those allegations relating to the amount of damages.[4]  "A trial court is vested with broad discretion in deciding whether to enter a default judgment."[5]

---

[1]Fed. R. Civ. P. 55(b).

[2]Fed. R. Civ. P. 55(b)(2)(B).

[3]10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 (3d ed. 1998).  *See also Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 n.11 (10th Cir. 2003) (after an entry of default, a defendant cannot defend a claim on the merits).

[4]*Beck v. Atl. Contracting Co.*, 157 F.R.D. 61, 64-65 (D. Kan. 1994).

[5]*Galloway v. Hadl,* Civ. A. No. 07-3016-KHV, 2008 WL 5109758, at *1 (D. Kan. Dec. 2, 2008) (citing *Grandbouche v. Clancy*, 825 F.2d 1463, 1468 (10th Cir. 1987)).

A default judgment does not establish the amount of damages.[6] "Although a default judgment forces a defendant to concede liability, it does not force it to concede liability for the amount of damages that a plaintiff has claimed."[7] The inquiry does not end just because a plaintiff requests a specific amount in its complaint.[8] A plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount; the plaintiff must also establish that the amount requested is reasonable under the circumstances.[9] "Damages may be awarded only if the record adequately reflects the basis for award via 'a hearing or a demonstration by detailed affidavits establishing the necessary facts.'"[10]

## II.     Findings of Fact and Conclusions of Law

### A.     Facts regarding liability

When a defendant is in default, the court accepts as true the factual allegations in the plaintiff's complaint except those relating to damages.[11] Thus, the Court accepts as true the following allegations in Plaintiff's First Amended Complaint:

---

[6]*Tebbets v. Price Sec.*, Civ. A. No. 93-2129-JWL, 1995 WL 28967, at *3 (D. Kan. Jan. 20, 1995) (citing *United States v. Shipco Gen., Inc*., 814 F.2d 1011, 1014 (5th Cir. 1987)).

[7]*Id.* (quoting *Shepherd v. Am. Broad. Cos.*, 862 F. Supp. 486, (D.C. Cir. 1994)); 10A Charles Alan Wright, Mary Kay Kane & Arthur R. Miller, *Federal Practice and Procedure* § 2688 (3d ed. 1998).

[8]*H20 Resorts Int'l, Ltd. v. Starlite Houseboats, Inc.,* No. 09-2124-CM, 2009 WL 2043499, at *2 (D. Kan. July 14, 2009).

[9]*Id.* (citing *Beck*, 157 F.R.D. at 65).

[10]*Adolph Coors Co. v. Movement Against Racism & The Klan*, 777 F.2d 1538, 1544 (11th Cir.1985) (quoting *United Artists Corp. v. Freeman*, 605 F.2d 854,857 (5th Cir. 1979)).

[11]*See Beck,* 157 F.R.D. at 64.

On or about October 4, 2007, Plaintiff timely filed with the Equal Employment Opportunity Commission ("EEOC") a charge of discrimination against Defendant on the basis of sex (sexual harassment). On or about June 20, 2008, Plaintiff timely filed with the EEOC an amended charge of discrimination against Defendant on the basis of sex (sexual harassment) and retaliation. On or about September 27, 2008, the EEOC issued to Plaintiff her Notice of Right to Sue, and this lawsuit was filed within 90 days of the EEOC issuing the Notice of Right to Sue.

Plaintiff became employed by Defendant in approximately October 2006. During the course of her employment with Defendant, Plaintiff was subjected to severe and unwelcome conduct of a sexual nature because of Plaintiff's sex, including, but not limited to, sexual comments and innuendo, and offensive bodily contact. The sexually offensive conduct was unwelcome to Plaintiff. She objected and complained about that conduct. Nonetheless, the sexually offensive conduct continued. The sexually offensive conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive. At the time, the sexually offensive conduct occurred and as a result of that conduct, Plaintiff believed her work environment to be hostile and abusive.

The conduct adversely affected the terms, conditions and/or privileges of Plaintiff's employment with Defendant and affected Plaintiff's ability to perform her job duties. Plaintiff complained to Defendant's management personnel about the sexually offensive conduct, and Defendant knew or should have known of the improper conduct but failed to take prompt and appropriate corrective action to end the harassment of Plaintiff. Instead, Defendant chose to terminate the employment of Plaintiff on or about September 24, 2007.

**B.     Findings of fact with regard to damages**

On September 8, 2009, pursuant to Fed. R. Civ. P. 55(b)(2), the Court conducted an evidentiary hearing on damages. Plaintiff and her father testified at that hearing. Defendant did not appear at the hearing. The Court found the testimony of both Plaintiff and her father to be credible. After considering the testimony and the demeanor of the witnesses, the undersigned Magistrate Judge makes the following findings of fact with regard to damages:

Defendant Tornado Innovations, L.P., d/b/a The Right One operates a dating and matchmaking service, owned by Ted Law and Shane Weisberg.[12]   Ted Law is president of Defendant. His office is in Dallas, Texas.[13]

Defendant has its headquarters in Texas. It has seven different offices in Texas, Colorado, Utah, and Kansas.[14]  Plaintiff worked in the Overland Park, Kansas, office from September 2006 until she was fired on September 24, 2007.[15]  Before her employment she was a customer of Defendant. She then started selling memberships. She eventually became a sales counselor. After working for Defendant about a year, she was promoted to assistant manager of membership

---

[12]Default J. Damages Hr'g Tr. 4: 23-24, 5:9-10, Sept. 8, 2009.

[13]Damages Hr'g Tr. 5:11-18, 9:20-23.

[14]Damages Hr'g Tr. 5: 23-25, 6:1-18.

[15]Damages Hr'g Tr. 7:10-18.

services.[16]  A week later, she was fired.[17]  During the time period Plaintiff was employed there, Defendant had 560 employees.[18]

After Plaintiff was hired, she talked on the telephone daily with the company president, Ted Law.[19]  During these calls Mr. Law commented on her appearance.  He stated he found her attractive, that she had a nice personality, that she was "quirky," and that she had great legs and great body.[20]  After learning that Plaintiff was getting divorced, the comments became very sexual in nature.[21]  He would ask her if she was wearing underwear.[22]  He would say that, were he not married, he would take her to bed "in a minute."[23]  He would ask personal sexual questions.[24]  On one occasion, Mr. Law told Plaintiff to go out on a date with a potential customer, in order to get the customer to enroll.[25]

---

[16]Damages Hr'g Tr. 7:19-25.

[17]Damages Hr'g Tr. 8:6-11.

[18]Damages Hr'g Tr. 8:20-25, 23:5-11.

[19]Damages Hr'g Tr. 10:1-5.

[20]Damages Hr'g Tr. 9:11-19, 11:1-3, 12:10-15.

[21]Damages Hr'g Tr. 9:18-19.

[22]Damages Hr'g Tr. 12:23-25, 13:1-2.

[23]Damages Hr'g Tr. 13:3-6.

[24]Damages Hr'g Tr. 19:6-8.

[25]Damages Hr'g Tr. 14:1-21.

Over the course of her employment, Plaintiff met Mr. Law face-to-face on at least five separate occasions.[26] When he came to the office where Plaintiff worked, he would stay three days at a time.[27] During one of those visits, at a presentation to a potential client, Mr. Law told Plaintiff to unzip her cardigan because she had great breasts and "that's what's going to sell the program."[28] On another occasion, he made her sit by him at dinner and rubbed her thigh.[29] On one occasion, he had Plaintiff purchase hair gel for him and told her that if she was lucky she would get to rub it in her hair, referring to the next morning.[30] It was conveyed to Plaintiff that when Mr. Law was in town, everyone in the office was expected to go out with him and do shots and party with him. Plaintiff believed that, if she did not go on these outings with Mr. Law, she would be fired.[31]

Plaintiff was subjected to almost daily verbal abuse by Mr. Law.[32] He would get mad and tell her she was fired and call her names, such as a fucking bitch, slut, skank, and worthless.[33] Then he would apologize and say that Plaintiff was his super star and she had a really great future with the company.[34] One Saturday, when she came into work to do a client consultation and the client

[26]Damages Hr'g Tr. 10:6-13.

[27]Damages Hr'g Tr. 10:11-13.

[28]Damages Hr'g Tr. 12:15-22.

[29]Damages Hr'g Tr. 16:4-6.

[30]Damages Hr'g Tr. 13:7-9.

[31]Damages Hr'g Tr. 13:10-15.

[32]Damages Hr'g Tr. 11:24-25, 12:1-9.

[33]Damages Hr'g Tr. 11:11-23.

[34]Damages Hr'g Tr. 11:21-23.

did not enroll, he got angry and fired her.  He told her to pack up all her stuff and to "get the fuck

out."[35]  He fired her on at least a dozen separate times.[36]  Then he would say he was sorry and say

she was doing great things.[37]

Plaintiff initially reacted to Mr. Law's comments and behavior by laughing it off because she

thought he was kidding, joking.[38]  But after his comments and behavior continued, she told him

"okay. That's enough."[39]  After he continued, she would avoid talking to him altogether.  One time

after Plaintiff rejected one of Mr. Law's advances, he made a point of calling her on her cell phone

and telling her how sexual harassment worked and that she would have to complain first, and if

nothing was done, then it is harassment.[40]  Mr. Law told her that if she ever made a complaint, he

would just fire her.[41]  In addition to calling Plaintiff at work, Mr. Law would also call her on her

personal cell phone.  He would also call her at times and on days when she was not at work.[42]

Plaintiff confided in another manager what Mr. Law had been doing and that she thought his

behavior was inappropriate.[43]  She told the manager that it was annoying and that she was tired of

---

[35]Damages Hr'g Tr. 18:1-11.

[36]Damages Hr'g Tr. 18:16-17.

[37]Damages Hr'g Tr. 18:16-20.

[38]Damages Hr'g Tr. 14:22-25, 15:1-3.

[39]Damages Hr'g Tr. 15:3-4.

[40]Damages Hr'g Tr. 15:13-20.

[41]Damages Hr'g Tr. 15:19-23.

[42]Damages Hr'g Tr. 10:16-23, 15:13-14.

[43]Damages Hr'g Tr. 19:2-9.

being asked all these sexual, personal questions.[44]  The manager then went and told Mr. Law; he in

turn then fired Plaintiff.[45]

Due to the verbally abusive comments, sexual innuendoes, sexually-explicit talk, and

inappropriate touching, Plaintiff felt dirty, gross, ashamed, and horrible.[46]  She felt like she could

not stop it because he was her boss and she did not want to lose her job.[47]  She felt insecure, like

trash, depressed, and angry.[48]  When the phone would ring, Plaintiff would get all jittery and start

sweating,  just because she did not know what he would say.[49]  She felt as if she were "walking on

eggshells."[50]

Plaintiff's relationship with her young son suffered as a result of Mr. Law's sexual

harassment.[51] She had poor self-esteem, felt like a failure, and was very demoralized.[52]  She was not

---

[44]Damages Hr'g Tr. 19:5-8.

[45]Damages Hr'g Tr. 19:8-9.

[46]Damages Hr'g Tr. 16:9-11, 19-23.

[47]Damages Hr'g Tr. 16:11-13.

[48]Damages Hr'g Tr. 17:4-7.

[49]Damages Hr'g Tr. 17:8-19.

[50]Damages Hr'g Tr. 12:6-9, 17:20-21.

[51]Damages Hr'g Tr. 28:3-6.

[52]Damages Hr'g Tr. 27:13-16.

in the frame of mind to be a good mother.[53] Her son, consequently, spent a significant amount of time with his grandparents.[54]

After she was fired, Plaintiff continued to experience stress, humiliation, and depression, which she attributes to the sexual harassment.[55] She experienced financial problems as a result of being fired. Her parents had to give her money to pay her rent, make her car payment, and for living expenses.[56] She finally moved back in with her parents.

Following termination of her employment, Plaintiff was without work for about five months.[57] She could not get out of bed and she felt like she had no hope.[58] She felt scared, depressed, devastated because she had no other source of income.[59] She was divorced and had no source of child support for her young son.[60]

Plaintiff's previously-planned vacation with her family was also impacted by the sexual harassment she suffered before being fired from her position.[61] She described the vacation as

---

[53]Damages Hr'g Tr. 28:2-6.

[54]Damages Hr'g Tr. 28:6-7.

[55]Damages Hr'g Tr. 20:9-11, 21:10-15.

[56]Damages Hr'g Tr. 26:13-25.

[57]Damages Hr'g Tr. 20:4-6.

[58]Damages Hr'g Tr. 21:10-15.

[59]Damages Hr'g Tr. 19:19-21, 21:10-15.

[60]Damages Hr'g Tr. 19:23-25, 20:1-3.

[61]Damages Hr'g Tr. 21:20-25, 22:1-13.

depressing, sad, stressful, constantly thinking about what was going on at home.[62]  Her father described her as devastated during the vacation and that she spent a good part of the trip in bed, rather than enjoying the vacation with her son and other family members.[63]

## III.    Damages Sought

The testimony of the sexual harassment Plaintiff suffered was credible.  The Magistrate Judge finds the behavior of Mr. Law, president and co-owner of Defendant, not only reprehensible but  repugnant and damaging to an employee and mother, such as Plaintiff, who tried to avoid and repel his advances.  As president of the employer company and as her supervisor, Mr. Law subjected Plaintiff to both verbal and physical sexual harassment, when he knew she was a single working mother who depended upon her employment.  Here, the liability of Defendant has already been determined by default.  The question remaining is the damages that Plaintiff has proved as a result of this harassment.

Fed. R. Civ. P. 54(c) limits the amount of damages that plaintiff may recover on default to the amount she claims in the prayer for relief in the complaint. Specifically, Rule 54(c) states that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."   In her First Amended Complaint, Plaintiff requests non-economic, compensatory damages in the amount of $300,000 attributed to humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, as well as post-judgment interest at a rate provided by law.  Under Rule 54(c), Plaintiff is therefore limited to the $300,000 in non-economic compensatory damages she requests in her First Amended Complaint.

---

[62]Damages Hr'g Tr. 22:10-13.

[63]Damages Hr'g Tr. 26:6-9.

Title VII allows compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.[64] As part of the Civil Rights Act of 1991, Congress imposed caps on the amount of "compensatory damages" plaintiffs may recover for non-economic damages, such as emotional pain and mental anguish, in sexual harassment claims.[65] These caps vary according to the size of the employer and the amount of compensatory damages which a plaintiff may recover depends on the number of defendant's employees.[66] Plaintiff testified that Defendant had 560 employees during the time she worked there and had that number of employees for 20 or more calendar weeks in the current or preceding calendar year.[67] Under 42 U.S.C. § 1981a(b)(3)(D), the sum of compensatory and punitive damages is limited to $300,000 against a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year. Thus, under 42 U.S.C. § 1981a(b)(3)(D), Plaintiff cannot recover more than $300,000 in compensatory damages.

At the hearing, Plaintiff and her father testified that she has suffered substantial physical, emotional and psychological harm as a result of Defendant's conduct. Plaintiff testified she was subjected to sexual harassment and verbal abuse by Mr. Law on a daily basis during her term of employment with Defendant. As a result of this sexual harassment Plaintiff felt depressed, ashamed, insecure, dirty, gross, horrible, and embarrassed. She would become upset and get "jittery," start sweating, and her blood pressure would rise when she thought she was going to have to speak to Mr.

---

[64]*See* 42 U.S.C. § 1981a(b)(3).

[65]*Id.*

[66]*Id.*

[67]Damages Hr'g Tr. 8:20-25, 23:5-15.

Law.  Plaintiff was undoubtedly upset and humiliated by the sexual harassment she suffered while employed with Defendant.  The sexual discrimination affected her ability to find work.  It also affected her relationship with her young son and her ability to be a good parent.  The Magistrate Judge finds Plaintiff's testimony credible and her emotional response and suffering understandable.

The evidence further leads to the conclusion that Defendant terminated Plaintiff's employment in retaliation for her having confided to another manager of the Defendant that the continuing sexual and personal advances and comments by Mr. Law were inappropriate and annoying to her.  The manager in whom Plaintiff confided informed Mr. Law of that complaint.  He then fired her, even though he had given her a promotion about one week earlier.  The termination aggravated her emotional distress.  Having received substantial income from the employment and a raise from her promotion, she now had no source of income.  Her unemployment lasted for five months.

Reasonable persons would probably arrive at different conclusions about a reasonable amount of damages to award in this case.  Some might find $300,000 to be excessive.  Others might find it not enough.  Plaintiff and her father have made a reasonable and persuasive showing that she experienced unwelcome sexual harassment by the President of the Defendant over the period of her employment, slightly more than a year, and that such harassment inflicted a serious, continuing impact of mental, physical and emotional stress that continued to adversely affect her personal life and that of her minor son.  Her problems continued after Defendant discharged her in retaliation for her complaints.   The Court should grant her request and find that Plaintiff is entitled to compensatory damages of $300,000 for her emotional distress, embarrassment, humiliation, and stress suffered as a result of the sexual discrimination inflicted upon her by Defendant and its

president and for terminating her employment in retaliation for having voiced her objections to the discriminatory misconduct. Based on the testimony at the hearing and her prayer for relief, the undersigned Magistrate Judge accordingly recommends that Plaintiff be awarded $300,000 in non-economic compensatory damages.

Plaintiff also requests post-judgment interest as provided by 28 U.S.C. § 1961(a). The Court agrees that post-judgment interest is permitted and recommends the damage award include post-judgment interest at the rate provided in 28 U.S.C. § 1961(a), which is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

Plaintiff and her attorney do not request an award of attorneys fees.

## RECOMMENDATION

The undersigned Magistrate Judge respectfully RECOMMENDS that the Motion for Default Judgment be GRANTED and that Plaintiff be awarded non-economic, compensatory damages in the amount of $300,000 and post-judgment interest at the rate provided in 28 U.S.C. § 1961(a).

Dated in Kansas City, Kansas, this 15th day of October 2009.

s/ Gerald L. Rushfelt
Gerald L. Rushfelt
U.S. Magistrate Judge